UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

FREE STREAM MEDIA CORP.,

Plaintiff,

v.

ALPHONSO INC., et al.,

Defendants.

Case No. 17-cv-02107-RS

**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**

I. INTRODUCTION

U.S. Patent No. 9,386,356 describes, among other things, a system for determining what a person is watching on television and, based on that information, delivering other content—such as an advertisement—to a mobile device also being used by that person. Plaintiff Free Stream Media Corp., which does business as "Samba" (hereafter "Samba"), owns the '356 patent and apparently markets commercial embodiments of the patent, which allow it to charge premium rates to advertisers who wish to target advertising to persons with known interests, based on those persons' television viewing patterns.

Defendant Alphonso, Inc.'s customers are also advertisers. Alphonso's services include a system whereby its customer's advertisements are sent to the mobile devices of specific categories of consumers, based on information gathered about those consumers' television viewing history. Alphonso likewise is able to command premium rates for such advertising because it is "targeted." Thus, in broad terms, there is no dispute that Alphonso's system accomplishes one of the same

broad tasks described in the '356 patent.  The issue is whether it infringes any of the asserted patent claims in doing so.  Because the undisputed facts regarding how Alphonso's system operates show it does not meet all of the claim elements, Alphonso's motion for summary judgment will be granted.

## II.  BACKGROUND

This action was filed in November of 2015 in the Eastern District of Texas.  It originally asserted infringement of U.S. Patent No. 9,026,668.  The parties have since stipulated to a finding of non-infringement of that patent.  The '356 patent remaining in suit was added to the litigation when a second complaint was filed in July of 2016, and subsequently consolidated.  In March of 2017, the Eastern District issued a claim construction order and transferred the case to this district, shortly thereafter.[1]

*a. The patent claims*

The asserted independent claims of the patent are 1, 10, and 18.  Perhaps because other patents have issued from the same original application, the specification includes a significant amount of material and terminology that is not reflected in the claims.  For example, the specification generally uses the term "networked device," which it suggests could be a television,

---

[1] Because Samba filed an amended complaint after the case was transferred here, Alphonso had an opportunity to bring an *Alice* motion, which was denied. Some months later, Alphonso sought reconsideration, or certification for interlocutory appeal, arguing that additional case law had emerged confirming that "targeted advertising" is an abstract idea.  The order denying reconsideration pointed out that the original order agreed the idea of targeting advertising is abstract. Samba, however, had insisted that the patent was directed at overcoming various technological barriers to communicating between a TV and a phone, and the motion was denied on that basis. Both the original *Alice* order and the order denying reconsideration acknowledged it was far from clear that the claims incorporated any such technological advancements described in the specification.  At this juncture it remains uncertain how the patent addresses technological barriers of the sort described by Samba. It is also not apparent how the accused Alphonso system embodies any such inventive approach to overcoming those purported barriers.

a set-top box, a computer, a multimedia display, an audio device, a weather measurement device, or a geolocation device. The asserted claims of the '356 patent, however, all expressly require "a television" in the role of the "networked device."

For purposes of the present motion, Claim 10 is representative. The critical language in Claim 18 is virtually identical. Claim 1 is worded somewhat differently, but there is no suggestion any distinctions among the claims affect the analysis. Claim 10 calls for:

> A relevancy-matching server communicatively coupled with a television and a mobile device through a network, comprising:
> a processor;
> a memory communicatively coupled with the processor; and
> instructions stored in the memory and executed using the processor configured to:
> match primary data generated using a fingerprint data with targeted data, based on a relevancy factor comprising at least one of a category of the primary data, a behavioral history of a user, a category of a sandboxed application, and another information associated with the user;
> search a storage for the targeted data,
> wherein the primary data is any one of a content identification data and a content identification history, and
> wherein the relevancy-matching server is to cause a rendering of the targeted data to the user through the sandboxed application of the mobile device.

The claim construction order provides that "fingerprint data" is "data representing characteristic features obtained, detected, extracted, quantized (sic), and/or hashed from audio or visual content." In more colloquial but less precise terms, "fingerprint data" is information extracted from a television show a consumer is watching that allows the system to determine what that show is.

"Primary data" – which in the claim must be at least in part "generated using fingerprint data"—has been construed as "data that may be associated with a user and matched with targeted data." "Relevancy factor" is a "criterion used for matching targeted data with primary data." "Targeted data" is "content recommendation, advertisement, product recommendation, and/or

other information related to primary data."

Accordingly, under claim 10, the "relevancy matching server" uses its processor to execute the instructions stored in its memory to match information about the user and what he or she is watching on television with "targeted data" based on a "relevancy factor," and then ultimately to deliver that "targeted data" to the user through his or her mobile device. Although the claims are not limited to advertising, one obvious application is to use the information about what television programming appears to interest a viewer to target related advertising to that viewer's cell phone.

### b. The accused technology

Alphonso does not make or sell televisions or phones. It provides a "platform" that allows its customers to target advertising to user's mobile devices.

#### 1) data collection

As reflected above, the claim requires fingerprint data/primary data to be collected by analyzing what a user is watching on television. Samba contends Alphonso does this in three ways. First, until early 2017, Alphonso purchased television viewing information from Vizio, a maker of smart TVs. Alphonso did not directly access the smart TVs. Pursuant to its contract with Vizio, it merely downloaded from "the cloud" the data Vizio collected.

Second, Alphonso has a relationship with the Sling content streaming service. Sling provides a software application that can be installed on mobile phones or other devices to allow streaming of certain television programing. Thus, while Sling is not a television, it allows mobile phones or other devices to function much like televisions. Alphonso's software development kit ("SDK") is included in the Sling software. The Alphonso SDK samples audio content streamed through Sling and transmits that data to the Alphonso platform.

Finally, Alphonso has recently started a relationship with Hisense, a maker of smart TVs. Allegedly the Alphonso SDK is now being installed in Hisense products, but discovery closed before that took place. Samba contends infringement can be inferred and assumed, based on existing information in the record regarding how the Alphonso SDK operates. Alphonso insists

there simply is no evidence as to how the SDK may operate in the Hisense TVs, whether it differs from the technology used in Sling, or even that the plans to incorporate it in Hisense TVs has ever come to fruition.

*2) data sorting*

Alphonso utilizes the data it purchased from Vizio and that it continues to collect through Sling as follows: Alphonso employees use software, Alphonso's Campaign Segment Tool, to create "segments" (subsets) of the data with whatever particular characteristics a customer may want for purposes of targeting advertising. The Campaign Segment Tool presents a screen to the Alphonso employee, displaying with various boxes and drop-down options for the employee to select. For example, if a customer wishes to target advertising to NFL fans, the Alphonso employee could designate the parameters for the segment as persons who viewed NFL games in the preceding week. The computer running the Segment Tool software would then search the data and generate a "segment" containing a list of IP addresses and/or device IDs that received NFL games in the designated time frame.

*3) creating advertising campaigns*

In the next step of its system, Alphonso utilizes a third-party demand side platform ("DSP") provided by a company called Beeswax, which is one of many DSP systems that allow companies to purchase available digital advertising space on user devices. Beeswax provides software known as the DSP Tool.

To create an advertising campaign, a customer provides Alphonso with an insertion order or "deal sheet," which includes a budget, a time frame for placing the advertisements, a geographic target, and the type of audience to target. The customer also provides the "ad creative"—an image, video, or URL link to an advertising image or video. To process a customer order, an Alphonso employee opens Beeswax. The employee manually completes fields and uses dropdown menus to enter information from the deal sheet, including the ad creative. Alphonso has

previously "registered" data segments with the Beeswax software. The Alphonso employee selects from drop down menus one or more segment names to be served the advertisement. Thus, the Alphonso employee determines which devices will receive a particular advertisement, based upon his or her understanding of what type of audience the customer is seeking to reach.

*4) delivery of advertisements to user phones*

Advertisements are delivered through a bidding system run by Beeswax. The process begins when a mobile device sends a bid request to a third-party advertisement server, which in turn sends the request to a third-party advertisement exchange. The bid request represents an opportunity to display a digital ad within an available space on the mobile device. For any given available ad space, the ad exchange may send the bid request to several DSP bidding systems. Upon receiving a bid request, Beeswax automatically determines whether to submit a bid on behalf of a particular advertiser based on the applicable campaign rules, including checking whether the mobile device ID/IP address in the bid request is one of those in the specified segment or segments. If the bid request satisfies the campaign rules, Beeswax may submit a conforming bid price and URL to the third-party server.

If the third-party advertising exchange selects the Alphonso bid, the exchange provides the URL of the ad creative included with that bid to the mobile device that sent the bid request. The mobile device uses the URL to obtain and display a digital ad from a third-party server. Alphonso does not supply software installed on the mobile device that submits bid requests, and has no contracts with any mobile device maker or mobile device user.

## III.  LEGAL STANDARD

Summary judgment is proper "if the pleadings and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The purpose of summary judgment "is to isolate and dispose of factually unsupported claims or defenses." *Celotex v.*

*Catrett*, 477 U.S. 317, 323-24 (1986). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Id*. at 323 (citations and internal quotation marks omitted). If it meets this burden, the moving party is then entitled to judgment as a matter of law when the non-moving party fails to make a sufficient showing on an essential element of the case with respect to which he bears the burden of proof at trial. *Id*. at 322-23. The non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The non-moving party cannot defeat the moving party's properly supported motion for summary judgment simply by alleging some factual dispute between the parties.

To preclude the entry of summary judgment, the non-moving party must bring forth material facts, *i.e.*, "facts that might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 588 (1986). The court must draw all reasonable inferences in favor of the non-moving party, including questions of credibility and of the weight to be accorded particular evidence. *Masson v. New Yorker Magazine*, Inc., 501 U.S. 496 (1991) (citing Anderson, 477 U.S. at 255); *Matsushita*, 475 U.S. at 588 (1986). It is the court's responsibility "to determine whether the 'specific facts' set forth by the nonmoving party, coupled with undisputed background or contextual facts, are such that a rational or reasonable jury might return a verdict in its favor based on that evidence." *T.W. Elec. Service v. Pacific Elec. Contractors*, 809 F.2d 626, 631 (9th Cir. 1987). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587.

Evaluating infringement in patent cases is a two-part inquiry: 1) claim construction; and 2) comparison of the properly construed claims to the accused product. *Lockheed Martin Corp. v. Space Sys./Loral, Inc.*, 324 F.3d 1308, 1318 (Fed. Cir. 2003). Here, claim construction is complete, and the remaining task is to compare the asserted claims to the Alphonso system. "[A] determination of infringement, both literal and under the doctrine of equivalents, is a question of fact." *Id*. Because the ultimate burden of proving infringement rests with the patentee, however, an accused infringer may show that summary judgment of non-infringement is proper either by producing evidence that would preclude a finding of infringement, or by showing that the evidence in the record fails to create a material factual dispute as to any essential element of the patentee's case. *See Novartis Corp. v. Ben Venue Labs., Inc*., 271 F.3d 1043, 1046 (Fed. Cir. 2001).

## IV. DISCUSSION

### A. "A relevancy-matching server communicatively coupled with a television"

Alphonso's first basis for arguing non-infringement is a contention that its technology does not include a relevancy-matching server communicatively coupled with a television. As to the alleged infringement through Vizio, Alphonso asserts that merely purchasing data from a third-party smart TV maker regarding its customers' viewing habits does not qualify as a server "communicatively coupled with a television." Samba responds that Alphonso cannot escape infringement merely by contracting out responsibility for one part of the system. Samba argues the Data License Agreement between Alphonso and Vizio contractually obligates Vizio to provide television viewing data to Alphonso in the manner and frequency specified, and therefore Vizio effectively was Alphonso's agent, despite a disclaimer of agency in the written agreement.

Samba insists there is at least a factual question as to whether Alphonso exercised sufficient control over Vizio that its data collection is attributable to Alphonso. Samba relies on case law arising in the context of method claims. *See*, *e.g.*, *Move, Inc. v. Real Estate Alliance*, Ltd., 709 F.3d 1117, 1122 (Fed. Cir. 2013) ("In cases in which more than one entity performs the steps of a claimed method or process, a party is liable for direct infringement only if that party exercises

'control or direction' over the performance of each step of the claim, including those that the party does not itself perform.")  Even assuming these system claims present no different issues, the record does not support a conclusion that Alphonso exercised sufficient control or direction of Vizio's data collection processes to attribute its conduct to Alphonso.  Specifying the manner and frequency for providing the data is not tantamount to controlling Vizio in the way its smart TVs functioned.  Notably, there is no reason to believe that Vizio carried out its data collection only because of its contract with Alphonso.  Accordingly, there is no basis to find infringement based on Alphonso's purchase of Vizio data, and summary judgment is appropriate with respect to that portion of Samba's claims.

Alphonso is also entitled to summary judgment to the extent Samba's claims are based on the supposed incorporation of the Alphonso SDK in Hisense smart TVs.  While requiring a party to file a separate suit is something to be avoided if possible, the record here simply does not permit a finding of infringement through an avenue that had not yet come into existence at the time discovery closed.[2]

As to infringement through Sling, summary judgment would not be appropriate merely because there is no "television" in the traditional sense.  At least at this juncture, Samba must be given the benefit of doubt that a trier of fact could determine a mobile device running the Sling application can function as a television within the meaning of the patent, and that Alphonso's SDK embedded in the application creates a potential basis for infringement.  Although Samba may be speculating to a degree that fingerprint data from a mobile device functioning as a television has been used in the Alphonso system to target advertising to a separate but associated mobile device, there is at least a triable issue of fact on that point.

---

[2]  In this instance, a separate suit for infringement through Hisense may nonetheless be foreclosed by other conclusions in this order.

B.  "Computer executed system' and "relevancy-matching server"

The real heart of Alphonso's motion lies in its argument that its platform relies on its employees to carry out the matching of advertising content to consumers' television viewing information.  Alphonso presents this point both by arguing that its system is not "computer executed" and contending the Alphonso platform lacks a "relevancy-matching server."

While Alphonso ultimately prevails on the grounds that it targets advertising to particular categories of consumers without employing a "relevancy-matching server," some of its focus on "computer-executed" is misdirected.  First, as Samba correctly points out, the discussion in the background section of the specification relates to a perceived need to avoid requiring an end user—a television-watching "couch potato" as Samba puts it—to engage in complicated procedures to install software or to configure his or her television and/or mobile device to allow information from the television to be used in delivering content to the mobile device. The inventor testimony relied on by Alphonso likewise relates to the issue of the "couch potato."

Whatever significance the background passages and inventor testimony might have to other construction or infringement issues, they are not germane to the dispute here.  Alphonso's non-infringement argument turns on the extent to which a human may be involved in the relevancy-matching process, not on what the "couch potato" does or does not have to do.  Indeed, to the extent the patent could be deemed to include a requirement that the end user be relieved from any need to configure devices, read manuals, or do any of the other things mentioned in the background, Alphonso's platform meets that requirement too.

Second, there may not always be a bright dividing line between "computer-executed" and a process carried out by a human.  Humans operators often must perform at least some role even in computerized operations.  Samba uses the example of a Google search, where the query must be formulated and input by a human, even though actually searching through the internet is carried out by software running on Google's servers.

That said, the claims here clearly require at least one process to be carried out by a computer that Alphonso instead relies on its employees to do, by exercising their own judgment

and then making the appropriate inputs to the computer.

The claim requires a relevancy-matching server that comprises (1) a processor, (2) a memory, (3) instructions stored in the memory that are executed using the processor and that "match primary data generated using a fingerprint data with targeted data, based on a relevancy factor." In other words, a computer runs an existing program (instructions stored in memory) to make the match between the primary data (gathered from the television) and the targeted data. In the Alphonso platform, computer programs do perform various critical functions. For example, the Segment Tool searches through the viewing data Alphonso has collected and returns results consisting of viewer device addresses for all viewers in the database meeting whatever criteria an Alphonso employee has specified. This is roughly equivalent to Samba's Google search example—a human has specified the search parameters, but the computer has performed the actual search.

In the Alphonso platform, however, the decision that results in a television viewer receiving a particular advertisement on his or her mobile device because it has been deemed relevant to what he or she is watching or has watched on television is made by an Alphonso employee, not a computer program applying a relevancy factor. The Alphonso customer specifies the desired characteristics of the audience for the advertising, and the Alphonso employee selects the data segment or segments he or she judges to be most appropriate, given the customer's wishes. By no stretch can that process be considered to be instructions stored in memory and executed on a processor to make the match.[3] Accordingly, Alphonso is entitled to summary

---

[3] Samba suggests the Alphonso platform can be found to infringe to the extent the Segment Tool matches the primary data with "other information matching or related to primary data," a phrase found in the claim construction for the term "targeted data." Claim 10 expressly requires "a rendering of the targeted data to the user through the sandboxed application of the mobile device." Samba has not shown that "other information" supposedly matched to the primary data is ever rendered to the user on the mobile device. While the other asserted claims do not include such a specific requirement that the targeted data be presented on a mobile device, Samba has not otherwise shown that the Segment Tool meets the relevancy-matching server limitation of any of the claims.

judgment of non-infringement, not limited as to any particular source from which it acquired viewing data.

### C. Mobile devices

As an independent basis for summary judgment, Alphonso argues it neither makes, sells, uses, or in any manner controls the consumers' mobile devices that request advertising and that may be served ads through the Alphonso platform. It points out it does not control when a mobile device sends a bid request, or direct a mobile device to do so. Alphonso notes it neither controls nor directs how people use their mobile devices.  As such, Alphonso contends, it cannot be liable for infringement with respect to the claim elements involving the mobile device.  Samba insists Alphonso nevertheless controls and profits from the entire process by which ads get delivered to mobile devices.  Samba is undoubtedly correct that Alphonso profits from the entire "system," as advertisers would not pay it were the ads not being displayed on consumers' mobile devices.  To be liable for direct infringement, however, Alphonso must *use* the entire system. "To 'use' the system, [the alleged infringer] must put the claimed invention into service, i.e., control the system and obtain benefit from it." *Centillion Data Sys., LLC v. Qwest Communications Int'l*, 631 28 F.3d 1279, 1284 (Fed. Cir. 2011).

Here, contrary to Samba's insistence that Alphonso controls and "curates" the entire process, at least one absolutely essential element remains entirely outside its control. Advertising from the Samba platform will never be delivered to a consumer's phone unless and until that phone issues a bid request.  Alphonso has nothing to do with the phone software or any of the conditions under which phones issue such requests.  Under *Centillion*, a party is not liable for direct infringement even where it supplies software for a customer to use, if the whole system is not put into use except by the customer. There is even less basis to hold Alphonso liable here where it supplies nothing to the end users whose devices must act to put the whole system in use.

Accordingly, Alphonso is entitled to summary judgment on this separate and additional ground.[4]

## V. CONCLUSION

Alphonso's motion for summary judgment of non-infringement is granted.[5] The pending Daubert motions and sanctions motions are denied as moot. Good cause appearing, the pending sealing motions are granted. A separate judgment will issue.

**IT IS SO ORDERED**.

Dated: December 28, 2018

RICHARD SEEBORG
United States District Judge

---

[4] Alphonso also argues *Centillion* precludes its liability with respect to the television element of the claims. The invocation of *Centillion* does not appear to add anything of substance to the issues relating to televisions discussed above.

[5] As a result, the individual defendants are also entitled to judgment in their favor. Were judgment in Alphonso's favor not warranted, the individuals likely would still be entitled to relief, as Samba has pointed to little more than vague allegations of potential grounds for alter ego liability or piercing the corporate veil. Because it might be necessary to determine if Samba has even preserved the right to pursue such claims at this stage in the proceedings, the issue of whether the individuals would have potential liability absent the conclusions above will not be decided at this juncture.